UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

    - against -                                    Docket No. 11 Cr. 1032 (PAE)

MOISES CUETO,
                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

# SENTENCING MEMORANDUM
(RECOMMENDATION OF SENTENCE)

*Attorney for Moises Cueto*

*Anthony L. Ricco*
ANTHONY L. RICCO, ESQ.
20 Vesey Street, Suite 400
New York, New York 10007
(212) 791-3919
*Tonyricco@aol.com*

Steven Z. Legon, Esq.
On the Sentencing Memorandum

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

     - against -                                      Docket No. 11 Cr. 1032 (PAE)

MOISES CUETO,
                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

       This Sentencing Memorandum is submitted pursuant to Rule 32 (f)(1) and (2) of the Federal Rules of Criminal Procedure, and it sets forth Moises Cueto's final objections to the Presentence Investigation Report and his Sentencing Recommendation. Moises Cueto requests that the court impose a sentence at variance with the Sentencing Guidelines, pursuant to the court's authority under *United States v. Booker*, 534 U.S. 220 (2005) and 18 U.S.C.§ 3553(a).

## I. Preliminary Statement and Basis For Relief Requested

Introduction

       On April 5, 2017, Moises Cueto pled guilty to a superseding information charging a murder in the aid of racketeering, in violation of 18 U.S.C. §1959(1)(a). It was alleged that on April 16, 2010, Moises Cueto, and others were intentionally involved in circumstances that recklessly caused the death of Juandy Paredes. On the date of the commission of the charged offense, Moises Cueto was 16 years of age, and is therefore considered a juvenile under federal law. See, 18 U.S.C. §5031.

       In this case, the Presentence Investigation Report (PSR) recommended a sentence, which if imposed, would result in Moises Cueto's imprisonment for 168 to 210 months. See, PSR, ¶147, page 23. However, the circumstances surrounding the commission of the offense, along with the presence of mitigating circumstances in Moises Cueto's background and social history, both prior and subsequent to his involvement in the charged offense, provides the basis for the consideration of a sentence at variance with guidelines. The concept that Moises Cueto's status as a juvenile at the time of the

commission of the offense - - along with the presence and confluence of other mitigating factors - - would warrant the consideration of a reduced sentence, is consistent with the recent decision of the Supreme Court in *Miller v. Alabama*, 567 U.S. 460 (2012), which held that it is unconstitutional to impose a mandatory life sentence upon a juvenile who commits murder before their 18th birthday.

## II. The Background & Personal History of Moises Cueto

<u>Early Years and Relevant Family Background</u>

Moises Cueto, who was born on May 17, 1993, is the third and youngest child born to the marital union between Rafael Cueto and Rosa Mary Herrera. At the time of his birth, the family resided in the town of Las Vegas, Dominican Republic. After a few years, the family moved to Los Rieles, Dominican Republic, due to a change in Rafael Cueto's employment. There was a great deal of turmoil in the Cueto household during the early years of Moises Cueto's life. During those years, Rafael Cueto was a heavy drinker who often physically and emotionally abused Rosa Mary Herrera.

By 1997, the young struggling couple separated, with Rafael Cueto immigrating to the United States and settling in Coral Springs, Florida, while Rosa and the three children remained in the Dominican Republic. In 1998, unbeknownst to the children, Rosa Mary Herrera became ill and was diagnosed with breast cancer, which required treatment and frequent hospitalizations. With her health declining, Rosa Mary Herrera was unable care for her three young school aged children. As a result, a decision was made for the children to move into the home of her parents in San Francisco DeMacoris, Dominican Republic.

Within six months, on May 11, 2001, Rosa Mary Herrera lost her three year battle with breast cancer and died at the young age of 37 years, leaving behind three devastated young children. Glenda Cueto recalls that her younger brother, Moises, was devastated at the funeral. At the time Rosa Mary Herrera died, Moises Cueto had just turned eight years of age. The untimely death of his mother was

a traumatic event, which impacted the emotional stability and growth of young Moises.

After the death of Rosa Mary Herrera, the children continued to reside with their grandparents in the suburban town of San Francisco de Macoris, Dominican Republic. The children did not have any direct contact with their father after his immigration to Florida in 1997, although he did provide financial support.

By 2004, Rafael and Glenda were in their early teenage years, and it was becoming too difficult for their aging grandparents to supervise them. Rather than separate the children and divide them among relatives, Rafael Cueto sent for his three children to come to the United States and reside with him and his new wife Ligia Tavares, in Coral Springs, Florida.

Life in The United States: Prelude To The Bronx

Moises and both of his siblings arrived in Coral Springs, Florida in 2004. By this time, Moises was 11 years old and had already been diagnosed as suffering from severe depression, for which he was receiving psychological counseling and anti-depressant medication. Life for Moises Cueto in Coral Springs was quiet and uneventful. However, Glenda never adjusted to living with her father's new wife, and eventually ran away from home. Rafael started to get involved with the wrong crowd, so his father sent him to the Bronx to live with his maternal uncle, Cristóbal "Rudy" Herrera. Moises remained in Florida, where he attended and completed grades seven through nine in Coral Springs public schools. However, Moises had very little memory of living with his father in the Dominican Republic, and he missed the love of his grandparents in the Dominican Republic, the presence of his brother (who was sent to the Bronx), his sister (who was no longer living at home), and of course, the love and adoration of his mother.

During the summer after completing 9th grade, Moises requested an opportunity to visit his older brother, who was then living in the Bronx. With great reluctance, his father acquiesced and allowed

3

Moises to travel to the Bronx to visit with Rafael for the summer. Unbeknownst to his father at the time, Moises was never to return to Florida.

Upon his arrival in the Bronx, Moises enjoyed being reunited with his older brother Rafael. But, Moises also enjoyed the freedom that Rafael had living with his uncle, as there was very little parental supervision from his uncle who was himself a young adult in his mid 20s. Moises, who was very lonely and depressed living with his father in Florida, pleaded to remain in the Bronx at the end of the summer. Rafael Cueto acceded to his young son's request and allowed him to remain in the Bronx. In the fall, 15 year old Moises Cueto enrolled in the 10th grade at Kennedy High School.

Kennedy High School, once a flagship of excellence in the New York City School system, had by the mid-1980's deteriorated into a dangerous place for students, with the presence of a proliferation of rivaling Bronx street gangs. Bronx street gangs recruited young teens with impunity every single day inside school and just outside the school doors. Moises very soon lost interest in attending Kennedy High School. Moises said that the school was filled with gangs, making it impossible to get back and forth to school and to attend classes without inevitable violent conflicts and confrontations. This environment, coupled with his now untreated depression and lack of parental supervision and guidance at home, resulted in Moises Cueto's declining interest in school work and the cutting of classes. It was during this time period, that Moises met Joan (ph) Vasquez ("Gordo") and other older teens, who were active members and associates of the racketeering enterprise known as the Bronx Trinitarios Gang (BTG).

Joan Vasquez ("Gordo"), who was 3 to 4 years older and heavily involved in the violence of street gang activity, took a particular interest in young Moises, who was 15 years old at the time. Of particular note, "Gordo" and the others were also heavily involved in the sale and distribution of a variety of narcotics. "Gordo" began supplying young Moises Cueto with Percocet, the highly addictive

combined opioid/non-opioid pain reliever.

At his young age, Moises Cueto had pre-existing mental health problems related to the death of his mother and his alienation living in Coral Springs, had previously been lawfully prescribed anti-depressants, and therefore was vulnerable to drug abuse. Through the abuse of Percocet, Moises Cueto - - an inexperienced and naive young teenager - - found relief from the loneliness he experienced, and a temporary escape from his depression. "Gordo," a street-smart, dangerous manipulator, began regularly supplying Moises Cueto with high doses of Percocet, and the young teenager quickly became addicted. Through the haze of his Percocet addiction, Moises found friendship and comradery with "Gordo" and others, but he did not share their deep bitterness and anger from growing up in the rough and dangerous streets of the South Bronx. Moises, who was raised in the tranquility of a rural community in the Dominican Republic and a semi-suburban neighborhood in Coral Springs, did not have the hardcore exposure to street violence. Instead, he had a natural aversion to, and fear of violence. "Gordo", on the other hand, though friendly to Moises Cueto, was a violent gang-banger who seemed to relish in acts of violence against others. It was a confluence of the above factors which influenced the conduct of young Moises Cueto on April 16, 2010, which resulted in the death of Juandy Paredes.

Circumstances of the Offense - The Setting

The tragic event of Juandy Paredes's death received nominal local press coverage at the time it occurred in 2010. At that time, it was simply deemed another sad episode of so-called "senseless violence" ending in the tragic death of yet another inner city teen of color at the hands of another.

While counsel is of the view that the death of Juandy Paredes, by all accounts a young teen of extraordinary promise, was a tremendously tragic event, his death is hardly the result of a "senseless act." The proliferation of violence in our nation's inner-city ghettoes, from Newburg, New York to the South

Bronx; from Brownsville and East New York to Chester, Pennsylvania (nation's per capita murder capital); from the South Side of Chicago to Compton and Nickerson Gardens in West Los Angeles, is the result of a purposeful social policy that trapped African American and Latino families into over-crowded segregated communities, which lacked adequate housing and real educational and employment opportunities. The result of these chronic conditions, fueled with the infestation of drugs, has resulted in a powerful cultural phenomenon, in which an unprecedented level of ignorance, self-destruction and hopelessness has replaced promise and hope for the future.

At age 15, Moises Cueto left the relative stability of Coral Springs, Florida to reside in the South Bronx, with very little adult supervision. Moises Cueto, depressed and emotionally struggling from the tragic death of his mother from breast cancer at age 37, began associating with other teens who lived in his neighborhood and were members of the Bronx Trinitarios Gang ("BTG").

The South Bronx neighborhood where Moises Cueto came to reside and call his new home, was and remains an area surrounded by several sprawling public housing projects, including the notorious Mitchell public housing projects; the equally notorious Forrest public housing projects, the Lester Patterson public housing projects, the Mott Haven public housing projects; the John Adams public housing projects, the Jackson public housing projects, the St. Mary's Park public housing projects, the Mill Brook public housing projects, the Robert Moore pubic housing projects, the Melrose public housing projects, and 11 others.

The proliferation of poverty and violence in this beleaguered community is legendary. The South Bronx is one of the most impoverished, crime-ridden neighborhoods in our nation, where the presence of poverty, menacing dangerous street gangs, and the proliferation of drugs and violence flourish as part of an epidemic dysfunctional culture dating back to the early 1960's.[1] Notwithstanding

---

[1] See, Evelyn Diaz Gonzalez, "*The Bronx*," at page 119, Columbia University Press (2013).

the revitalization of other New York neighborhoods, the staggering cycle of poverty, drugs and violence have remained firmly entrenched in the South Bronx in devastating numbers since the mid 1970s.[2] In the absence of powerful role models and dedicated programs and community members, the numbers of young teens who embrace the proliferation of gangs and the attending culture of violence in order to survive has become legendary. The indictment itself identifies gangs such as the *Bloods*, *Dominicans Don't* Play, the *Crips*, the *Latin Kings*, *El Combo*, *Violate All Bitches*, and *Sunset/268*. However, there are hundreds of other street gangs, as every enclave, public housing project, Mitchell-Lama housing, and row of dilapidated tenements has its own group of young teens, who travel in packs in order to safely attend school or to venture into other parts of the Bronx and New York City. This is the backdrop for the conduct of Moises Cueto with his encounter with Juandy Paredes on April 16, 2010.

Factors and Circumstances Related to the Death of Juandy Paredes

There are very few facts in dispute related to the circumstances which led to the confrontation and death of young Juandy Paredes. On April 16, 2010, Moises Cueto planned to go to the movies with a date, but before leaving - - while his date was getting ready - - Moises Cueto stopped by the apartment of a neighbor of "Gordo." There were others present, including "Gordo", who were playing video games and engaging in social media. "Gordo" and the others were enraged by threatening comments made by a rival group of neighborhood teens directed towards "Gordo" on social media. The rival teens were provoking and threatening violence on social media against "Gordo", who vowed to seek a violent revenge. "Gordo" encouraged Moises Cueto and others to join him to search for and attack the rival teens. Initially, Moises Cueto had no interest, as he was only there to get Percocet and proceed on his date to the movies. Moreover, contrary to what is stated in paragraph 86 of the PSR, Moises

---

[2] See, Jill Jones, "*South Bronx Rising, The Rise, Fall and Resurrection of an American City*," page 9, Fordham University Press (2002).

Cueto did not know of, nor did he have any prior contact with the rival teens who were threatening violence against "Gordo." However, after ingesting a dosage of Percocet supplied by "Gordo," and being goaded into doing so, Moises Cueto agreed to join them. "Gordo" also supplied Moises with a kitchen knife. Then, "Gordo", Moises Cueto, and another teen known to Moises as Amarfis Pozo, went into the street to search for the rival teens.

Once in the street, "Gordo", Moises Cueto, and Amarfis Pozo spotted three teens that "Gordo" recalled making the threats on social media. Moises confronted the teen later known to be Juandy Paredes, while "Gordo" and Amarfis Pozo chased after the other two fleeing rivals. During the confrontation, Moises Cueto intentionally but reluctantly stabbed Juandy Paredes. Moises Cueto believes that he stabbed him "two or three times." As Juandy Paredes tried to run away, "Gordo" reappeared and repeatedly stabbed at Juandy Paredes. See, PSR, ¶ 86, page 16.

After the stabbing, Moises Cueto was told to return to an apartment with "Gordo." Once there, "Gordo" and his uncle "Maro" (ph) told Moises Cueto to remain inside the apartment until they could find out exactly what happened to the person who had been stabbed. At the apartment, Moises Cueto was given more Percocet by "Maro," which he ingested. Later in the evening, they learned that Juandy Paredes had died from the stab wounds. The very next morning, "Gordo" and his uncle purchased one-way tickets for travel to the Dominican Republic. "Maro" escorted both "Gordo" and Moises Cueto to the airport in a taxi, where the two boarded a flight to the Dominican Republic. Sixteen year old Moises Cueto fled the United States at the direction of "Gordo" and "Maro," without notifying anyone in his family. Upon arriving in the Dominican Republic, Moises Cueto telephoned his grandparents, who came to pick him up from the home of relatives of "Gordo." <u>The Return To The United States and Steps Towards Redemption</u>

After his grandparents picked him up, Moises Cueto had no further contact with "Gordo" in the Dominican Republic. After approximately seven months, Moises returned to the United States. The Cueto family had no knowledge of Moises' involvement in the events which led to the death of Juandy

8

Paredes on April 16, 2010. Moises returned to living with uncle Cristóbal "Rudy" Herrera; however, upon his return to the United States, Moises Cueto completely disassociated and distanced himself from any further involvement with anyone who was associated with the Trinitarios.

Still a teenager, Moises Cueto found a job, joined a local church, sought God's forgiveness, and began the long journey towards his redemption. Since his return to the United States, Moises Cueto has not had any significant contact with law enforcement, nor any involvement in conduct that would lead him to such contact - except for continued bouts with depression, which have, on occasion, caused him to relapse into drug abuse.

Since his return to the United States, two months before his 17th birthday, Moises Cueto has struggled to overcome his addiction to Percocet. However, there have been lengthy periods of time when Moises Cueto has been able to escape drug use, focus on his employment and lead a responsible life. During this time period, Moises has held various jobs; he obtained a CDL license and drove a taxi, worked as lifeguard at Bali's resort in Manhattan, and also worked with his relatives selling merchandise for a successful family flee market business. However, Moises Cueto's periods of success have been interrupted by depression (exacerbated by bad dreams he has had about his participation in events that led to the death of Juandy Paredes), and his ultimate return to the abuse of prescription pain killers, such as Percocet. Nevertheless, by the time Moises Cueto was taken into custody by law enforcement on June 12, 2016, he had, in fact, made tremendous strides from the criminal conduct he participated in on the very worst day of his young life.

Before departing the Bronx in 2015, to reside with his uncle Cristóbal "Rudy" Herrera (who by that time had escaped life in the Bronx and moved to Allentown, Pennsylvania),[3] Moises Cueto occasionally ran into "Gordo" on the streets. On those occasions, "Gordo," who was still involved in

---

[3] Cristóbal "Rudy" Herrera encouraged Moises Cueto to move to Pennsylvania. Cristóbal "Rudy" Herrera thought that the change of environment and life in Pennsylvania would help Moises overcome his depression and reoccurring addiction to Percocet.

gang-banging and acts of violence, mocked and ridiculed Moises Cueto, and laughed at Moises Cueto's attendance and participation at church. Nevertheless, young Moises, who learned a powerful life lesson from the death of Juandy Parades, continued on his path, unfazed by "Gordo's" taunts.

Redemption

There is no question that Moises Cueto must be punished for his conduct which led to the death of another young and promising teen from the Bronx. However, Moises Cueto does not have the benefit of a cooperation agreement to mitigate against the harshness of the sentence to be imposed. Nevertheless, Moises Cueto has an exemplary record of modest achievement, a strong faith in God, and a sincere goal to seek redemption for his conduct.

Moises Cueto remains a very quiet, unassuming young person; the type of personality that gives one pause for his well being as he transitions into life in prison. However, at his core, Moises Cueto is a person of integrity, who through his very strong faith in God has found an internal courage that he lacked as a teenager. To assist him on his journey, Moises Cueto has the continued support of a strong loving family. His family is committed to helping Moises Cueto - - the only family member ever known to have been arrested for a crime - - to reach the promise that was almost permanently derailed in a moment of ignorance and impulsiveness - - when he was just 16 years old. Finally, Moises Cueto genuinely seeks the forgiveness of the family of Juandy Parades, the understanding of the United States Attorney's Office, and the court to permit leniency in his case.

The above factors have not been presented to the court as an excuse for the commission of the crime. As the Supreme Court case law and statutory authorities clarify, mitigation evidence is not permitted as an excuse or justification for engaging in criminal conduct, but rather as mitigation in the length of sentence or punishment to be imposed as a result of that criminal conduct. See, *Lockett v. Ohio*, 438 U. S. 586 (1978), *Abdul Kabir v. Quarterman*, 550 U.S. 233 (2007);[4] 18 U.S.C. §3661 and 21 U.S.C.

---

[4] As Justice O'Connor noted in her concurring opinion in *California v. Brown*, 479 U.S. 538 (1987), evidence about the defendant's background and character is relevant because of the belief, held by this

§859.

In this case, the Presentence Investigation Report (PSR) recommends a sentence, which if imposed, would result in Moises Cueto's imprisonment for 168 to 210 months. While Moises Cueto's objections to the PSR do not impact the total offense level and the corresponding sentencing range, however, his objections do - - for the reasons set forth in detail below - - serve as a basis for the court to consider the imposition of a sentence at variance with the guidelines.

### III.  Sentencing Recommendation

As stated above, Moises Cueto requests that the court impose a sentence at variance with the Guidelines, pursuant to the court's authority under 18 U.S.C. §3553(a). In the pre-*Booker* era, the fate of an offender like Moises Cueto was determined entirely upon the application of the numerical assessments and policy statements set forth in the Guidelines, and in his case the imposition of a mandatory life sentence.[5] In this case, utilizing the numerical range of imprisonment suggested by the Guidelines violates Moises Cueto's right to due process of law and the sentencing goals of 18 U.S.C. §3553(a), which mandates that the sentence imposed include an assessment of a defendant's individual background and history.

The numerical range deemed applicable to Moises Cueto under the Sentencing Guidelines fails to include (within its calculation) any numerical value or consideration of the most profound and devastating mitigation factors relevant to Moises Cueto's life narrative - - *the manner in which his youth at the time of the offense influenced his criminal conduct and the impact those factors have upon the length of the sentence to*

---

society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable for sentencing purposes than those who have not had such experiences. *Id.* at 545.

     [5]     The count of conviction ordinarily carries a mandatory sentence of life imprisonment or death. However, the defendant was a juvenile at the time of the offense. Accordingly, pursuant to *Roper v. Simmons*, 543 U.S. 551 (2005) (holding execution of juvenile offenders unconstitutional), and *Miller* v. *Alabama*, 567 U.S. 460 (2012) (holding life imprisonment without parole of juvenile offenders unconstitutional), the maximum penalty is life imprisonment with no mandatory minimum term.

*impose.* The Guidelines have yet to employ any calculation for the critical factors related to the vulnerability of age as discussed by the Supreme Court in *Miller v. Alabama*, 567 U.S. 460 (2012).

### IV. Application of Law at Sentencing

<u>The Application of the Reasoning in *Miller v. Alabama* to 18 U.S.C. §3553(a)</u>

At the time of the commission of the crime in this case, Moises Cueto was a juvenile. In *Miller v. Alabama*, *supra*, the Supreme Court observed that there are occasions when juveniles engage in horrific acts of violence (including murder) and that their conduct is the result of a combination of factors related to the vulnerability of their age, and not as the result of a formed mind.[6]

In *Miller*, the Supreme Court, further extended the reasoning advanced in its landmark decisions in *Roper v. Simmons,* 543 U.S. 551 (2005) and *Graham v. Florida*, 560 U.S. 48 (2010), and held that the Eighth Amendment protects offenders from criminal conduct committed prior to their 18th birthday, including prosecutions for murder. In *Miller*, the Supreme Court reiterated that the "concept of proportionality is central to the Eighth Amendment" and that it is important to therefore consider the frailties of age when imposing harsh prison sentences of the type which are imposed upon an adult offender. The Supreme Court observed that "age matters" and that juveniles are less mature and more prone to impulsive and heedless risk-taking; and are particularly vulnerable to recklessness and negative peer pressure. The Supreme Court observed that since adolescence is transitory, juveniles are less likely to be found "irretrievably depraved." This logic naturally extends to consideration of whether a Guidelines sentence sufficiently accounts for conduct of a juvenile offender.

The Supreme Court held that the sentencing court must consider a juvenile offender's age and consider the hallmark features which include, *inter alia*; immaturity, impetuosity, the failure to appreciate risks and consequences, family and home environment that surrounds the juvenile, and the manner in

---

[6] As a result, in *Miller v. Alabama*, *supra*, the United States Supreme Court held that the mandatory sentences of life without the possibility of parole for juvenile offenders violates the Constitution's Eighth Amendment prohibition against cruel and unusual punishment.

which peer pressure may have effected the juvenile offender and his participation in the charged offense(s). Finally, the Supreme Court observed that with time, some young offenders evolve and grow.

Moises Cueto is one such young person, and each of those factors observed by the Supreme Court applies to his conduct of April 16, 2010, and thereafter. Moises Cueto cannot undo his conduct which contributed to the death of Juandy Paredes, however, during the past six years, Moises Cueto has sought redemption, has expressed genuine remorse, and has demonstrated that he is capable of living in society as a responsible, law abiding citizen, without the imposition of the type of sentence that would be imposed upon an adult offender under similar circumstances.

Remorse, Rehabilitation and Steps Towards Redemption

The court should be aware that Moises Cueto has expressed true, heartfelt remorse for his actions in connection with the death of Juandy Paredes. From our very first meetings at the M.D.C., Moises Cueto acknowledged responsibility for his participation in stabbing death of Juandy Parades.

From the earliest stages of the case, defense counsel engaged in plea negotiations with the government prosecutors. As a result of defense counsel's negotiations with the government, Moises Cueto was offered a plea agreement which included the guideline for second degree murder. See, Guideline 2A1.2. Moises Cueto accepted the terms of the agreement which were negotiated by his defense counsel and the government prosecutors.

Post Arrest Rehabilitation

While Moises Cueto has been detained in this case, he has not had a single infraction nor any violation of institutional rules at the M.D.C. See, PSR, ¶76, page 14. To the contrary, Moises Cueto has participated in several educational programs at the M.D.C., including his successful completion of a 14 week program designed to increase religious studies, accepting mistakes and wisdom entitled "House of Healing". His certificates will be attached to a separate supplemental submission.

In addition to his participation in positive educational and career oriented courses while

detained, for the past 8 months, Moises Cueto has held a coveted job working in the kitchen. His responsibilities have increased from washing pans, to preparing food trays for meals that are transported to the Special Housing Unit. Moises Cueto's exemplary conduct during his detention is an extension of the positive steps that he has taken in his life since the date of the incident on April 16, 2010 to the time of his arrest on June 30, 2016.

During that six year time period, from April 2010 until the date of his arrest on June 30, 2016, Moises Cueto made his peace with God. Although Moises Cueto continued to struggle with overcoming his addiction to prescription drugs, he worked hard, holding many responsible jobs, and resumed his life as a loving caring member of his family. Most importantly, Moises Cueto overcame his vulnerability to adolescent peer pressure. Fully aware that his unacceptable conduct resulted in the death of an innocent teen, Moises Cueto walked away from the negative influences, and specifically from people who helped to serve to derail his life, such as Joan Vasquez - who, undaunted by the loss of life, continued engaging in horrific acts of violence. At the time of his arrest, the once promising young boy, was 23 years of old and well on his road to redemption.

Rehabilitation and Letters of Support

Moises Cueto's family members have submitted heartfelt letters of support. See, *Supplemental Sentencing Memorandum*. The letters attest to the promise of a young man, which is not reflected, or accounted for in the federal sentencing guideline calculation. To describe Moises Cueto's character and personality, the family letters are replete with glowing words such as "humble," "amazing," "religious," "faithful," "supportive," committed, with a "wonderful spirit and energy," "an outstanding young citizen," with a "soft look in his eyes, " "very polite," with a "respectful personality." The family members describe a gentle, soft spoken boy, who was helpful and considerate; someone who stood in sharp contrast to the 16 year old who found himself stabbing another teen on April 16, 2010. How did this come about? What were the influences that converted this gentle young boy into a reluctant, but intentional participant in acts of violence that are regularly played out in the South Bronx? The family

14

letters help the court understand Moises Cueto's individual life journey. The letters accurately describe the young man whom counsel has gotten to know over the past year at the M.D.C.; a young man who accepted responsibility for his actions, and who - - from the very beginning - - expressed genuine remorse and regret.

The tragedy endured by Moises Cueto is best summed up and accurately described by his sister, Glenda Cueto in her letter.

> "At 16 years of age, unfortunately Moises let himself be influenced and peer pressured by malicious and selfish people. Unfortunately he found comfort in his friends, and considered them family. He is extremely regretful for what has happened, and that is most likely the reason why he let himself fall so deeply into the addiction of drugs. I feel like at that age he did not understand the magnitude of this situation, and being that he was on drugs at the time of this crime, it made everything worse."

\* \* \* \* \*

> "My older brother and I used that pain and struggle to progress and better ourselves but Moises was too young, only being eight at the time of my mother's passing, he never understood the reasons why certain things happened, and was to fragile to mature when it was needed from us. I think it's very important for you to understand that Moises is not a violent person by nature, and we believe that rehabilitation may be something that should be a part of his penalty instead of a lengthy jail sentence. He has never had a criminal record, anything indicating that he is a bad person who is capable of committing such a heinous crime. He has completely turned around in the last few years and still in progress."

See, *Supplemental Sentencing Submission, page* A-12.

Moises Cueto's life long family pastor, the Reverend Salvador Ros, Rector, of the Church of the Good Shepherd, writes that

> His life, however, has been fraught with its fair share of adversity and pain. There are some events in his life, which adversely affected him and his siblings, principally the untimely death of his mother, Mary, to cancer when he was a child; and, the continual absence of his father, who resided and worked in the United States to support him and his family. In addition, Moises's uprooting and traveling to the US, arriving in Florida, later, his uprooting again and subsequent move to New York to live with his uncle. This created an unstable and vulnerable environment. Moises' desire to have a family, have a sense of belonging created the need be accepted. At the time, his feeling of abandonment lead him to venture to seeking incorporation into a surrogate family.

\* \* \* \* \*

> My years of pastoral experiences working with youth in the Lower Eastside and the South Bronx call to mind the pain and sorrow I have experienced standing by families who lost a loved ones to violence, especially gang violence. Having said this, it is important that you understand that Moises has a loving family and extended network of social relationships, his father, Rafael, his sister, Glenda, his brother, Rafael Arturo, countless cousins, aunts and uncles and myself. He has a support system, which a one point in his life failed him, but is ready and willing to continue to support his rehabilitation and recovery.

See, *Supplemental Sentencing Submission, page* A-7. Reverend Salvador Ros reminds us that as a Christian priest and pastor he fundamentally believes in the redemption of man.

Pathway To Redemption

Many years ago, as a young lawyer at the very beginning of my career, I appeared before the Hon. Leroy Kellum, a long retired and now deceased state court judge, who observed in his consideration of an appropriate sentence for a first time offender, that the "*first step towards rehabilitation is recognizing that you have made a mistake and taking steps to correct that mistake.*" In this case, Moises Cueto has done just that, he long ago took that important first step, by recognizing that he made an horrendous mistake in judgment by committing an act that resulted in the death of another person, by seeking forgiveness from God and actually taking positive steps to improve his life.

As noted above, Moises Cueto began the journey towards his redemption, long before his arrest in this case. For six years prior to his arrest, Moises Cueto's actions demonstrate that his effort to rehabilitate himself, and to seek his redemption, is very sincere. As result of the foregoing, Moises Cueto prays for a sentence at variance with the Guidelines.

In *Pepper v. United States*, 131 S.Ct. 1229, 1239-40 (2011), the Supreme Court observed

> "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S.Ct. 1229, 1239-40 (2011) quoting *Koon v. United States*, 518 U.S. 81, 113 (1996).

A sentencing calculation that focuses only on the offense and does not include, in it's

16

calculation, the individual characteristics of the defendant is unreasonable. See, *United States v. Olhovsky*, 562 F.3d 530, 549 (3rd Cir. 2009). Sentencing courts have a duty to consider the full range and specific characteristics of the defendants, along with a consideration of the circumstances of the offense, in determining the appropriate sentence. Therefore, the presentment of the fullest information possible concerning the defendant's life and characteristics is highly relevant, if not essential, to the selection of an appropriate sentence. *Pepper v. United States*, 131 S.Ct. at 1240; *Williams v. New York*, 337 U.S. 241, 247 (1949).

Inclusion of the widest breadth of information concerning the offender's background and history ensures that the punishment will suit not merely the offense (as is the primary focus, and perhaps responsibility, of the government) but also the individual characteristics and background of the defendant (which is the mandate of Congress). *Pepper v. United States*, 131 S.Ct. at 1240; *Wasman v. United States*, 468 U.S. 559, 564 (1984). In *Miller v. Alabama*, supra, the Supreme Court has provided legitimacy to the argument that the factors which impact and influence the criminal conduct of juvenile offenders must be taken into consideration in determining whether the Guidelines sufficiency address the individual assessment of the juvenile offenders criminal conduct in this case.

At age 24, Moises Cueto is a work in progress; a soft spoken individual who possesses extraordinary promise; someone who has demonstrated the ability to overcome some of the obstacles of his past; but someone who nevertheless remains flawed. The letters of support, along with his modest achievements with continued employment over a period of six years and jobs that he held at M.D.C., demonstrates that Moises Cueto has the capability, coupled with the love and support of committed family and friends, to meaningfully seek his redemption; and that a sentence at variance with the Sentencing Guidelines, in the range of 120 months imprisonment, to include special conditions of supervised release (therapy and counseling), will serve to punish Moises Cueto, and to protect the public from the remote likelihood of his future criminal conduct.

## V.  Conclusion

  Moises Cueto does not have a U.S.S.G. § 5K letter to obtain leniency from the punishment and consequences of his past criminal conduct.  Instead, Moises Cueto relies upon his genuine remorse, regret and redemption, based upon his hard work, faith in God and willingness to do the right thing - - not for the sake of leniency - - but because of true righteousness and redemption.  The information regarding the circumstances endured by Moises Cueto during his childhood has been provided to give the court additional insight into the confluence of circumstances which combined to explain Moises Cueto's criminal conduct as a teenager.  The information is not offered as an excuse for criminal conduct, but rather to assist the court in its determination of the appropriate sentence to be imposed in his case, as demonstrated in *Miller v. Alabama*. There were tragic circumstances present in Moises Cueto's life which led to and influenced his vulnerability for involvement in juvenile criminal conduct.

  As a result of the foregoing, Moises Cueto requests that the court impose a sentence of 120 months at variance with Guidelines.  In this case, such a sentence is sufficient but not greater than necessary to reach the sentencing goals of Congress.

Dated:  New York, New York
    July 13, 2017

                Respectfully submitted,

                *Anthony L. Ricco*
                Anthony L. Ricco, Esq.

ALR/jh
cc:  A.U.S.A.  Matthew LaRouche